LOCAL NO. 214, TEAMSTERS v CITY OF DETROIT

Docket No. 78-2301. Submitted March 19, 1979, at Detroit.—Decided July 10, 1979. Leave to appeal applied for.

Teamsters, Local No. 214, as union representative of correctional officers employed at the Detroit House of Correction (DeHoCo), petitioned the Michigan Employment Relations Commission (MERC) for a formal determination as to whether the officers were eligible for arbitration under a statute providing for compulsory arbitration of labor disputes in municipal police and fire departments. MERC held that it possessed the requisite jurisdiction necessary to effect a settlement of a controversy, and in addition ruled that the prison guards were within the act's coverage and therefore entitled to compulsory arbitration. The City of Detroit and DeHoCo appeal that determination alleging that MERC lacks the jurisdiction and authority to hear and decide the question of plaintiff's eligibility for compulsory arbitration, that MERC erred in determining that DeHoCo is a state rather than a city facility and that the correctional guards were subject to the same or similar hazards faced by Detroit policemen. *Held:*

1. MERC has jurisdiction and authority to hear and decide eligibility of public police and fire department employees for the compulsory arbitration of labor disputes.

2. Correctional guards at DeHoCo are employed by the City of Detroit; therefore, they are city employees and come, in that respect, within the ambit of the statute providing for compulsory arbitration of labor disputes in municipal police and fire departments.

3. The statute providing for compulsory arbitration of labor disputes in municipal police and fire departments applies to public employees engaged as policemen, or firemen or subject to

REFERENCES FOR POINTS IN HEADNOTES

[1-3, 5] 48A Am Jur 2d, Labor and Labor Relations §§ 1764, 1773-1775, 2026.

Validity and construction of statutes or ordinances providing for arbitration of labor disputes involving public employees. 68 ALR3d 885.

[4] 48 Am Jur 2d, Labor and Labor Relations §§ 1368, 1420, 1421.

the hazards thereof. The guards at DeHoCo are not part of the public police department and to be eligible for compulsory arbitration they must be subject to the risks and hazards faced by City of Detroit policemen. A MERC decision is conclusive if supported by competent, material and substantial evidence on the record considered as a whole. Where the Court of Appeals is unable to say that an agency's findings are devoid of the necessary record support in a close case, due deference should be given to the agency's administrative expertise and the Court should not invade the province of exclusive administrative fact-finding by displacing the agency's choice between two reasonably differing views.

Affirmed.

M. J. KELLY, J., dissented. He would hold, from his review of the evidence presented, that plaintiffs failed to carry their burden of establishing that correctional guards at DeHoCo were, and are, subject to the same risks and hazards as members of the Detroit Police Department. The guards are not eligible for compulsory arbitration under the statute and the MERC decision should be reversed.

OPINION OF THE COURT

1. LABOR RELATIONS — MICHIGAN EMPLOYMENT RELATIONS COMMIS-
   SION — JURISDICTION — PUBLIC EMPLOYEES — POLICEMEN AND
   FIREMEN — ARBITRATION OF DISPUTES — STATUTES.

   The Michigan Employment Relations Commission has jurisdiction and authority to hear and decide the question of the eligibility of public police and fire department employees for the compulsory arbitration of disputes (MCL 423.231 *et seq.;* MSA 17.455[31] *et seq.).*

2. LABOR RELATIONS — PUBLIC EMPLOYEES — POLICEMEN AND FIRE-
   MEN — ARBITRATION OF DISPUTES — STATUTES.

   The act providing for compulsory arbitration of labor disputes in municipal police and fire departments applies to any department of a city, county, village or township having employees engaged as policemen, or in fire fighting or subject to the hazards thereof (MCL 423.232; MSA 17.455[32]).

3. PRISONS — DETROIT HOUSE OF CORRECTION — CORRECTIONAL
   GUARDS — ARBITRATION OF DISPUTES — STATUTES.

   Correctional guards at the Detroit House of Correction are employed and paid by the City of Detroit; therefore, they come, in that respect, within the ambit of the act providing for

compulsory arbitration of labor disputes in municipal police and fire departments (MCL 423.232; MSA 17.455[32]).

4. APPEAL AND ERROR — ADMINISTRATIVE LAW — MICHIGAN EMPLOYMENT RELATIONS COMMISSION — FACT FINDING — EXPERTISE — CONSTITUTIONAL LAW — STATUTES.

A decision of the Michigan Employment Relations Commission is conclusive if supported by competent, material and substantial evidence on the record considered as a whole; therefore, where the Court of Appeals is unable to reach the conclusion that the agency's findings were devoid of the necessary record support in a decidedly close case, due deference should be given to the agency's administrative expertise and the Court of Appeals should decline to invade the province of exclusive administrative fact-finding by displacing the agency's choice between two reasonably differing views (Const 1963, art 6, § 28, MCL 423.23[e]; MSA 17.454[25][e]).

DISSENT BY M. J. KELLY, J.

5. LABOR RELATIONS — PUBLIC EMPLOYEES — POLICEMEN AND FIREMEN — ARBITRATION OF DISPUTES — DETROIT HOUSE OF CORRECTION — GUARDS — RISKS AND HAZARDS — STATUTES.

*Compulsory arbitration of labor disputes extends to public employees engaged as policemen, or in firefighting or subject to the hazards thereof; correctional guards at the Detroit House of Correction are not part of the city public police department and to be eligible for compulsory arbitration of their labor dispute they must be subject to the hazards of city policemen; therefore, where record evidence indicates that the guards are not subject to the same risks and hazards as members of the Detroit Police Department, compulsory arbitration should be denied (MCL 423.232; MSA 17.455[32]).*

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Jon M. DeHorn,* Assistant Attorney General, for Michigan Employment Relations Commission.

*Kasoff, Young, Gottesman, Kovinski, Friedman & Walkon, P.C.* (by *Howard L. Shifman),* for Teamsters Local No. 214.

*Roger E. Craig,* Corporation Counsel, *George G.*

*Matish,* Deputy Corporation Counsel, and *Michael A. Hurvitz,* Assistant Corporation Counsel, for defendants.

Before: D. C. RILEY, P.J., and M. J. KELLY and BEASLEY, JJ.

D. C. RILEY, P.J. On October 6, 1977, plaintiff, the union representative of correctional officers employed at the Detroit House of Correction (hereinafter, DeHoCo), petitioned the Michigan Employment Relations Commission (hereinafter, the Commission) for a formal determination as to whether the officers were eligible for arbitration under the compulsory arbitration statute, MCL 423.231 *et seq.;* MSA 17.455(31) *et seq.*

In an order dated May 17, 1978, the Commission held that it possessed the requisite jurisdiction necessary to effect a settlement of the controversy, and in addition ruled that the prison guards were within the act's coverage and therefore entitled to mandatory arbitration. The City of Detroit and DeHoCo appeal that determination by leave, raising three issues, only one of which merits distended consideration.

Defendants' initial argument, that the Commission lacks the jurisdiction and authority to hear and decide the question of plaintiff's eligibility for compulsory arbitration, has been recently rebuffed by this Court in *In The Matter of Metropolitan Council 23, AFSCME, AFL-CIO,* 89 Mich App 564; 280 NW2d 600 (1979), wherein it was held that the legislative intent to afford public employees within the scope of the act an expeditious and effective procedure for the resolution of disputes[1] would be ill-served by imposing the protracted delays ger-

[1] MCL 423.231; MSA 17.455(31).

mane to initial court review and resolution of the act's comprehensiveness. Defendants' claim, therefore, is without merit.

Defendants also maintain that the Commission erred in determining that DeHoCo is a state rather than a city facility.

MCL 423.232; MSA 17.455(32) defines "public police and fire department", to which the compulsory arbitration act applies, as follows:

> "any department of a city, county, village or township having employees engaged as policemen, or in fire fighting or subject to the hazards thereof."

Assuming, *arguendo,* the validity of defendants' contention, *Green v Dep't of Corrections,* 30 Mich App 648, 652; 186 NW2d 792 (1971), *aff'd* 386 Mich 459; 192 NW2d 491 (1971), we are no closer to a resolution of the ultimate dispute on appeal, which is, whether the Commission erroneously ruled that the correctional officers were within the purview of the act. As is readily apparent from the provision above, the focal point of conflict is not whether DeHoCo is a city or state institution, but rather the identity of the prison guards' employer. Since the guards are employed and paid by the City of Detroit, they clearly come, in this respect, within the ambit of the statute.

Hence, we turn to the dispositive issue, whether the Commission's holding that the officers in question were subject to the same or similar hazards as faced by Detroit policemen was in accordance with the law and supported by competent, material and substantial evidence. Const 1963, art 6, § 28, MCL 423.23(e); MSA 17.454(25)(e), *Michigan Employment Relations Commission v Detroit Symphony Orchestra, Inc,* 393 Mich 116, 121-124; 223 NW2d 283 (1974).

Executive Deputy Chief James Bannon testified regarding the hazards generally encountered by Detroit police officers. They included walking beats, riding motorcycles, responding to radio reports of crimes, riding in patrol cars, and investigating narcotics cases, sex-related offenses, robberies and homicides. The police are charged with the general enforcement of all the criminal laws of the state, be they misdemeanor, felony, or motor vehicle connected. Police officers have an obligation to carry their identification cards, badges and guns even when off duty, and, accordingly, to respond to life threatening situations at any time. Police must assist firemen in their work. They also must respond to and intervene in family squabbles, which is one of the most dangerous of police activities since, on the national average, 50% of the police officers killed or injured are killed or injured in responding to domestic calls. Statistics were introduced evidencing the high rate of injuries resulting throughout the entire spectrum of police activities. Bannon also indicated that, due to the stress of police work in urban communities, police officers have the highest occupational rates of suicide and divorce, and one of the highest rates of alcoholism in the country.

The functions of the correctional guards, and their attendant risks, were explained by various witnesses, including the director of DeHoCo. Their testimony may be summarized as follows: the officers are responsible for maintaining order throughout the detention facility, and also patrol its perimeters on foot and in vehicles. They are accountable for the custody of prisoners to and from police agencies, courts and hospitals. In the event of a prisoner escape, they pursue and initially attempt an apprehension, always with the

aid of weapons. They search prisoners and visitors for contraband such as weapons or narcotics; however, their power extends only to detention of the wrongdoer—the local police are alerted to effectuate the arrest. Although the guards are on call 24 hours a day, they are not authorized to carry a weapon or make an off-duty arrest. Most do not carry guns as part of their daily routine, but a full range of weapons (including mace, teargas, and other riot equipment) are kept on the premises for issue when necessary. Officers have, on occasion, been assaulted through prisoner attack, though not anywhere nearly as frequently as Detroit policemen. However, the potential for these attacks coupled with instances of inter-inmate conflicts exposes them to risks from which they suffer physical injuries.

Upon a careful review of the evidence and testimony proffered, we are unable to reach the conclusion that the Commission's finding was devoid of the necessary record support. We view the instant case as a decidedly close one, and accordingly afford due deference to administrative expertise and decline to "invade the province of exclusive administrative fact-finding by displacing an agency's choice between two reasonably differing views". *Michigan Employment Relations Commission v Detroit Symphony Orchestra, Inc, supra,* at 124.

Affirmed. Costs to plaintiff.

BEASLEY, J., concurred.

M. J. KELLY, J. *(dissenting).* I agree with the majority on the first two issues: namely, the jurisdiction of the commission and should the correctional guards be employed by the City of Detroit. Since they are obviously not part of the city public

police department, the dispositive issue here is whether they were, and are, subject to the same or similar hazards as those faced by Detroit policemen.

The interpretation and application of the statutory language embodied in MCL 423.232; MSA 17.455(32), by the MERC is the focal point of this argument. This language is as follows:

"Public police and fire departments means any department of a city, county, village, or township having employees engaged as policemen, or in firefighting or *subject to the hazards thereof.*" (Emphasis added.)

I believe the MERC board and its hearing officer erred in determining that the correctional officers were subject to the hazards police officers encounter and I would find, therefore, that the plaintiffs were ineligible for compulsory arbitration under the statute. In *Michigan Employment Relations Commission v Detroit Symphony Orchestra, Inc,* 393 Mich 116, 121; 223 NW2d 283 (1974), it was stated:

"The standard of appellate review of MERC Board findings of fact is set forth in the labor mediation act as follows:

" '* * * The findings of the board with respect to questions of fact if supported by competent, material and substantial evidence on the record considered as a whole shall be conclusive. * * *' MCL 423.23(e); MSA 17.454(25)(e).

"This standard comports with Const 1963, art 6, § 28 which sets forth the minimum constitutional scope of judicial review of administrative decisions."

Later in this case, the Supreme Court elaborated on this standard of review, stating:

"What the drafters of the Constitution intended was a thorough judicial review of administrative decision, a review which considers the whole record—that is, both sides of the record—not just those portions of the record supporting the findings of the administrative agency. Although such a review does not attain the status of *de novo* review, it necessarily entails a degree of qualitative and quantitative evaluation of evidence considered by an agency. Such review must be undertaken with considerable sensitivity in order that the courts accord due deference to administrative expertise and not invade the province of exclusive fact-finding by displacing an agency's choice between two reasonably differing views. Cognizant of these concerns, the courts must walk the tightrope of duty which requires judges to provide the prescribed meaningful review."

There is no argument, and there can be no argument, that plaintiffs were members of the Detroit Police Department. Plaintiffs' counsel stipulated that they were not. Let us then examine the comparative hazards. The hazards of police department work were set out in the testimony of the Executive Deputy Chief of the Detroit Police Department, James Bannon. His testimony suggests that city police are exposed to hazards of such variety, scope, and intensity as to lead me to conclude that the MERC board's findings were not supported by competent, material and substantial evidence on the record considered as a whole.

The city police officers have a wide range of duties and resultant hazards, including walking beats, riding motorcycles, responding to radio reports of crimes, riding patrol cars, investigating narcotics cases, sex-related offenses, robberies and homicides. The police are charged with the general enforcement of all the criminal laws of the state, be they misdemeanor, felony, or motor-vehicle connected. Police officers have an obligation to carry

their identification cards, badges, and guns even
when off duty, and to respond to life threatening
situations at any time. Police must assist firemen
in their work. They also must respond to and
intervene in family squabbles, which is one of the
most dangerous of police activities since, on the
national average, 50% of the police officers killed
or injured are killed or injured in responding to
domestic calls. Statistics were introduced showing
the number of injuries resulting to police through
the entire spectrum of police activities. They
showed that out of approximately 4,000 field offi-
cers, 2,728 can be expected to be injured in some
way in the course of a year. Deputy Chief Bannon
also indicated that, due to the stress of police work
in urban communities, police officers have the
highest occupational rates of suicide and divorce,
and one of the highest rates of alcoholism in the
country.

The functions of the plaintiffs' correctional
guards at the Detroit House of Correction (De-
HoCo), and the hazards attendant to those func-
tions, were outlined by its director, William Rucks.
The following facts were revealed: The day shift at
DeHoCo consists of about 22 correctional guards,
only two of whom carry a weapon on duty. None
of the correctional guards are authorized to carry
a weapon or make an arrest while off-duty. If the
guards discover that contraband is being smuggled
into DeHoCo, they can only detain the wrongdoer.
They must alert a local police department to effec-
tuate the arrest. As to occupational hazards, wit-
ness Rucks related that, in his 23 years at De-
HoCo, no guard had been stabbed or shot and he
could only recall four to six guards being injured
by prisoner attacks. Further, he recalled only
about three incidents where weapons had to be

issued to the correctional guards. Although there were other witnesses presented whose testimony also addressed this issue, their descriptions of the occupational hazards of the plaintiffs were consistent with that of Mr. Rucks.

I do not think that the plaintiffs carried their burden of establishing that they were, and are, subject to the risks and hazards to which members of the police department are subject. Therefore, the MERC board determination should be reversed and the plaintiffs held not entitled to compulsory arbitration under the statute.